UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

LYLE F. TRAXLER,

        Plaintiff,

        v.                             Case No. 22-cv-0760-bhl

MARY MOORE, et al.,

        Defendants.

## DECISION AND ORDER

Plaintiff Lyle Traxler, an inmate at Oshkosh Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on deliberate indifference claims based on allegations that a right, lower leg wound was inadequately treated, eventually resulting in his leg being amputated below the knee. On June 5, 2023, Defendants Dr. Eric Nelson, Mary Moore and Robert Weinman moved for summary judgment. The following month, on July 7, 2023, the Court granted Traxler's motion to appoint counsel, but extensive efforts to recruit a lawyer to represent Traxler on a volunteer basis proved unsuccessful. Accordingly, on April 29, 2024, the Court ordered Traxler to respond to Defendants' motions without the assistance of counsel. *See* Dkt. No. 114. After obtaining several extensions of time, Traxler responded to Dr. Nelson's motion on August 20, 2024, and to Moore and Weinman's motion on September 17, 2024. For the reasons explained below, the Court will grant Dr. Nelson's motion and will deny Moore and Weinman's motion.

## BACKGROUND

At the relevant time, Traxler was a prisoner primarily confined at the Waupun Correctional Institution. Weinman worked as the nursing supervisor/health services manager at Waupun.

Moore worked as an advanced practice nurse prescriber and was Traxler's assigned advanced care provider at Waupun. Dr. Nelson was employed by the Fond du Lac Regional Clinic as an orthopedic surgeon. Traxler is a diabetic with morbid obesity, hypertension, and a history of diabetic ulcers. Defendants explain that diabetes can reduce the ability of skin to heal itself, so even small cuts can develop into diabetic ulcers, and chronic, non-healing wounds are vulnerable to infection. For purposes of this case, Traxler's wound care needs, which ultimately resulted in the amputation of his lower right leg, began in October 2020 and spanned about a year. During that year, Traxler was seen more than a hundred times by health staff at Waupun, the Dodge Correctional Institution infirmary, St. Agnes Hospital, Waupun Memorial Hospital, and Mercy Hospital. Dkt. Nos. 91, 128; at ¶¶1-7; Dkt. No. 138 at ¶¶1-5, 15-19, 42.

On October 14, 2020, Traxler was seen in the health services unit at Waupun by a nurse in response to complaints about his lower legs. Traxler received wound care on October 15 and 27 and November 11, 16, and 30, 2020. On December 7, 2020, Traxler was seen by a nurse for treatment on his left leg, when he mentioned that his right lower leg also hurt. The nurse noted that the front of Traxler's calf had a thickening and hardening of soft tissue and was at risk for infection. After a doctor was consulted, Moore ordered an antibiotic. Traxler was instructed to elevate his leg and apply warm compresses. Traxler's dressing was changed two days later, and he was given wound care supplies. Wound care appointments were scheduled as needed in response to the amount of drainage. Traxler asserts that nurses would change his bandages in the morning, and he would change them in the evening. Nursing staff cleaned and assessed the wound on December 17, 20, and 21, 2020. Dkt. No. 138 at ¶¶22-23, 26-29.

On December 23, 2020, after Traxler had completed a course of antibiotics, Moore examined Traxler's leg wound. Moore ordered a culture of the wound, referred Traxler to St.

2

Agnes for further evaluation and treatment, and submitted wound care orders. Traxler's wound was again assessed and cleaned the following day, and his dressing was changed. The culture came back on December 26, 2020 and showed some bacterial growth, but methicillin-resistant staphylococcus aureus (MRSA) was not detected. The doctor was consulted, and she ordered an antibiotic, which was taken to Traxler that same day. Traxler was seen by a nurse on December 29, 2020 for wound care, and he was told that the plan was to see him daily for dressing changes. Dkt. No. 138 at ¶¶30-36.

On December 31, 2020, Moore received a message from a nurse reporting that Traxler's wound was draining twice as much as the week before and was brown, yellow, and red in color. The nurse also reported that Traxler was experiencing pain and tenderness and asked Moore to look at the wound. Moore responded that Traxler was on her list to be seen. St. Agnes took over managing Traxler's care in January 2021, and he was being seen by them every week or other week. According to Moore, St. Agnes staff noted that Traxler was reporting pain and tenderness to the wound, but no recommendation for additional pain medication was made. Traxler explains that St. Agnes staff informed him that they did not have to recommend anything else for pain because it was up to prison medical staff whether to prescribe additional pain medication. During this time, Traxler was prescribed Tylenol, duloxetine (often used for pain caused by nerve damage associated with diabetes), and celecoxib (often used for swelling, stiffness, and joint pain), all of which he took consistently but, according to Traxler, were insufficient to address the pain from his leg wound. Dkt. No. 138 at ¶¶24-25, 37-40,

On January 6, 2021, Traxler was sent to a St. Agnes specialist for wound care. He was just finishing up a 7-day course of a combination of two antibiotics called Bactrim. At the visit, a nurse practitioner debrided the wound, i.e., removed the damaged tissue. The discharge instructions

3

noted that the packing should be changed a couple times a week, with the outer dressing being changed daily or twice daily depending on the drainage. The instructions also stated that Traxler should lay down at least three hours a day. Traxler asserts that the instructions also noted that he was concerned about pain, but Moore highlights that there was no mention of a need to change his pain medication. Dkt. No. 138 at ¶¶41-44.

Traxler was seen a week later at St. Agnes for a follow-up. A nurse practitioner noted his wound had tunneling, which is an opening under the surface of the skin. She also noted that the area was clean with no reddening, no infection, and no need to debride the wound. The nurse practitioner wanted to see Traxler again in two weeks, and the discharge instructions indicated staff should continue to pack the wound with iodoform and cover with gauze, ABD, and kerlix. She also stated Traxler should wear tubigrip E or compression stockings; she stated "no Coban please." Coban is a self-adherent wrap used to provide compression or support or to secure dressings. Finally, she recommended he continue to lay down and should eat good protein and keep his sugars in check. Dkt. No. 138 at ¶¶45-46.

Subsequent nursing notes discuss changing the dressing on Traxler's wound and securing it with a tube stocking on January 16, 17, and 25, 2021. But Traxler asserts that nursing staff continued to use Coban for that following week, despite instructions not to do so. He states that there were no dressing changes from January 18-24, 2021. He also asserts that he did not receive a high protein meal tray, although he does not explain what kind of protein he was already receiving as part of his diabetic food tray. Dkt. No. 138 at ¶¶45-46.

On January 26, 2021, a Waupun nurse noted a moderate amount of brown/yellow drainage on the dressing. Traxler also reported having increased pain. The nurse told him she would update the provider and informed him he had an appointment at St. Agnes the following week. Moore

4

received a notice that Traxler described his pain as needles being poked in his wound. She asked nursing to remind Traxler to take his prescribed medication, including duloxetine, which often relieves this type of pain. Traxler asserts that duloxetine had been prescribed years earlier to address his carpal tunnel pain and provided no relief for the pain from his leg wound. Dkt. No. 138 at ¶¶47-49.

On February 1, 2021, Traxler was seen offsite at St. Agnes by a doctor in the general surgery unit. The doctor reported that Traxler's pain level was moderate and drainage from his wound was minimal but that the wound/ulcers were worsening with the use of iodosorb packing rather than twice daily compression changes. The doctor debrided the wound and noted that the bone was not exposed and there was no cellulitis, which is a potentially serious bacterial skin infection. The doctor believed that the wound was regressing and instructed that more compression was desirable. He ordered the wrapping to be changed twice weekly. He also asked to see Traxler in one week for further debridement. Traxler received wound care at Waupun consistent with the orders. Dkt. No. 138 at ¶¶50-52.

On February 8, 2021, during wound care, a nurse noted that the wound area had considerable drainage tinged with blood and a brown, foul-smelling liquid. There was also yellowish-grey tissue in the opening of the wound. Traxler went to St. Agnes the following day, on February 9, 2021. The nurse practitioner noted that Traxler had a good debridement the week before and that, although the wound was deeper, it was improving. She noted that the four-layer compression wrap had been helpful. The nurse practitioner debrided the wound and found no signs or symptoms of infection. Dkt. No. 138 at ¶¶53-54.

On February 10, 2021, Moore saw Traxler for unrelated matters concerning his esophageal and colonoscopy results. At that time, Moore and Traxler discussed his chronic pain and his

referral to the pain clinic. Moore increased Traxler's prescription for duloxetine. Traxler clarifies that duloxetine helped with his nerve pain issues in his wrists and hands, but it was never effective to address the pain associated with his leg wound and was not prescribed for that purpose. Traxler asserts that he repeatedly told Moore and the nursing staff that the pain medication he was receiving did not help address his leg pain. Traxler's dressing was changed on February 11, 15, and 18, 2021, consistent with the off-site provider's instructions. Dkt. No. 138 at ¶¶55-56.

On February 19, 2021, Traxler was again sent to St. Agnes for management of his right leg wound. A nurse practitioner noted that the tunneling had been slow to fill in but had improved and showed no signs of infection. She performed another debridement. Her instructions included a notice to stop packing the wound because she suspected that it was keeping the wound open. She also instructed, among other things, to use a pad to absorb the drainage and to change the dressing twice a week. Traxler received wound care at Waupun on February 22 and 25, 2021. Dkt. No. 138 at ¶¶57-59.

On March 1, 2021, Traxler was again seen at St. Agnes. A nurse practitioner ordered a biopsy because of the longevity of the wound and because she observed abnormal looking tissue. The wound was debrided, after which it was much larger, although there did not appear to be any infection. The nurse practitioner ordered that the four-layer wrap be changed three times per week. Dkt. No. 138 at ¶¶60-61.

On March 11, 2021, Traxler was seen by the Waupun health services nursing coordinator for a wound care consult. Traxler's wound appeared to be worsening and getting deeper and the area was visibly painful with any type of cleaning or probing. The nurse recommended a different type of dressing and discussed other recommendations with Moore, who ordered a vascular surgery consult. A few days later, Traxler had a venous insufficiency ultrasound, which showed

no blood clots in his lower leg that might have been preventing his wound from healing. On March 16 and 19, 2021, Traxler's dressing was changed consistent with the nursing coordinator's recommendation. Dkt. No. 138 at ¶¶62-64.

On March 22, 2021, a nurse noted that the wound had a large amount of bloody drainage and an odor. The skin was painful to the touch, red, and irritated, and a lab culture was taken. The results showed staphylococcus aureus but no MRSA. A few days later, a nurse asked if health services could check Traxler's labs and start him on Ensure high protein. Moore ordered both. Because Traxler's wound was not responding to the treatment recommendations of the St. Agnes providers, Moore referred him to general surgery at Waupun Memorial Hospital. Dkt. No. 138 at ¶¶65-68.

On March 31, 2021, Traxler was examined by Dr. Karen Reynolds. She performed a more intensive debridement, where she operated on Traxler and cut out all the dead tissue and sterilized the wound. Dr. Reynolds stated that no antibiotics were required, but she noted that if the wound became soupy, health services should start either Bactrim or Clindamycin. Traxler was discharged the next day with instructions that he elevate his leg while resting, avoid prolonged ambulation, and take showers, not baths. She also stated that the wound should be packed with iodoform gauze twice a day, wrapped with wet to dry gauze, and covered with compression. Dr. Reynolds also recommended the pain medication Norco, which is a combination opioid medication, at least one hour prior to wound changes for the first week. Moore responded by submitting an authorization form for 56 tablets of Norco. Dr. Reynolds' discharge instructions, including the pain medication recommendation, was placed as orders for nursing staff to follow, although Traxler asserts that the nurses did not follow them. According to Traxler, he received his morning pain medication during the 6:30 a.m. medication pass, and his dressing changes occurred at 9:30 a.m. This appears

7

consistent with Dr. Reynolds' recommendation that he receive pain medication at least one hour prior to the dressing change to allow the medication to take hold. Traxler asserts that for the evening dressing changes, however, he did not receive his pain medication until two hours *after* the dressing changes. Traxler further contends that he notified Moore and Weinman that Dr. Reynolds' instructions were not being followed. Dkt. No. 138 at ¶¶69-72; Dkt. No. 140 at ¶7; Dkt. No. 141 at ¶23.

Traxler received wound care every day in April 2021 except for April 1, 2021. On April 4, 2021, a nurse reported that packing the wound was painful, but Traxler was able to tolerate the rest of the dressing change. Traxler had taken his pain meds two hours before the dressing change. The nurse also applied Vaseline around the wound to lessen the itching. Traxler reported that it felt better instantly. According to Traxler, despite Dr. Reynolds ordering twice daily dressing changes, nurses did not change his dressing on April 3 and 5-9, 2021. It is unclear if Moore was aware that dressing changes had not occurred as ordered. Dkt. No. 138 at ¶¶73-78.

Traxler was seen again by Dr. Reynolds on April 19, 2021. A lab culture was obtained, and Dr. Reynolds instructed to continue with twice daily wet to dry dressing changes and 10 days of antibiotics. She stated that, if the wound worsened on oral antibiotics, IV antibiotics were recommended. She requested another lab culture in 14 days. Moore ordered a 10-day course of antibiotics on April 22, 2021. Dkt. No. 138 at ¶¶73-78.

On May 5, 2021, Moore sent Traxler to Waupun Memorial Hospital to have his wound evaluated. He stayed at the hospital until May 15, 2021 after undergoing a surgical debridement. Hospital staff used a wound vac, which removes pressure over the area of the wound to assist healing, and he was treated with oral and IV antibiotics, although both were discontinued before he was discharged. There was exposed bone, but the wound showed good signs of healing on

8

discharge. Upon discharge, Dr. Reynolds ordered wound vac changes on Monday, Wednesday, and Friday. She also recommended Traxler be pre-medicated with oxycodone one hour prior to the wound vac change. She stated that, if the wound vac failed, wet to dry dressings should be used until the problem could be resolved. A doctor at the prison signed off on the instructions and placed an authorization form for oxycodone, which was later approved for chronic use through at least June 2021. Dkt. No. 138 at ¶¶79-84, 86-89.

After Traxler returned to the prison, he had wound dressing and vac changes consistent with the discharge orders, although Traxler highlights that on two occasions, the care he received was a day late (on a Thursday) or a day early (on a Sunday). On May 30, 2021, Traxler saw a nurse for his wound vac dressing change and reported that the wound vac had stopped working during the night and had not been working properly the day before. Traxler asserts that he notified officers that his wound vac had stopped working, but no one contacted health services until the next morning. The nurse applied a wet to dry dressing per Dr. Reynold's discharge orders and requested a new vac machine, which was received later that day. After the machine arrived, a nurse changed his dressing and noted some redness around the wound, which was reported to the on-call doctor. The doctor ordered that an antibiotic be given to Traxler right away. Traxler was reminded to immediately notify health services if the wound vac malfunctioned because skin breakdown can happen very quickly with the wound vac system. Dkt. No. 138 at ¶¶85, 90-93.

Two days later, on June 1, 2021, a nurse saw Traxler for a wound vac dressing change and reported that the wound was worse. The doctor agreed to keep Traxler on the antibiotic, and an appointment with Dr. Reynolds was moved up. Traxler was also given a low tier bunk and first floor restriction. The nurse reported that health services was trying to get an appointment at

9

Waupun Memorial Hospital as soon as possible and that Traxler had been referred to the Dodge infirmary, where he would be monitored more frequently. Dkt. No. 138 at ¶¶94-97.

Traxler was seen at Waupun Memorial Hospital on June 8, 2021. Traxler was to have a follow-up appointment at the hospital in two days. It was also recommended that pain medication be increased as needed, that he be transferred to the Dodge infirmary, that his movement be limited to the bathroom only, and that a seal be kept on the wound. The next day, Moore saw Traxler and, in response to his complaints of discomfort, contacted the hospital to see if the dressing could be changed and she increased his oxycodone dosage. The dressing was changed after the hospital approved Moore's request. Dkt. No. 138 at ¶¶98-104.

From June 10, 2021 to July 14, 2021, Traxler was housed at the Dodge infirmary, where he continued to receive onsite and offsite wound care. Traxler saw Dr. Reynolds on June 16 and July 7, 2021. After Traxler returned to Waupun, he was scheduled for dressing changes on Mondays, Wednesdays, and Fridays. On July 18, 2021, Traxler submitted a health services request stating that his leg was healed at 90+% and he wanted his single cell status back. Traxler received wound care every other day in August 2021, in addition to offsite appointments. On August 5, 2021, a nurse noted that while the wound was healing, the tissue around the wound continued to be red and irritated with every dressing change. Moore requested a culture of the wound and instructed the nurse to use zinc cream on the tissue around the wound. For the first time, the presence of MRSA was detected, so Moore ordered a 10-day course of antibiotics. Traxler asserts that he was never informed MRSA was present. Although the wound appeared to be improving from August 7-25, it deteriorated from August 27-September 1, 2021. The wound stabilized for a few days, but started to further deteriorate on September 6, 2021, when nurses noted the presence

10

of drainage. Traxler asserts that he was in a lot of pain during this time. Dkt. No. 138 at ¶¶105-120.

On September 7, 2021, Traxler was seen by a nurse, a doctor, and Weinman. A wound vac was ordered and an offsite appointment was set for the following week. The doctor suggested Traxler discuss with his offsite provider a referral to the Dodge infirmary because he had experienced successful results there. Daily dressing changes three times a day continued. About a week later, the offsite provider recommended no wound vac, wet to dry dressing, and no antibiotics, but two days later he sent a message to health services to restart Traxler on oral antibiotics because the culture had grown MRSA. Traxler opposed being put back on oral antibiotics because he believed them to be ineffective. On September 22, 2021, Moore submitted a request for tramadol for Traxler's leg pain. Traxler returned to the hospital for evaluation because the wound was not healing and had recently gotten worse. Dkt. No. 138 at ¶¶121-22, 124-25.

On September 27, 2021, Traxler reported that he was feeling feverish. He was ordered to stay on antibiotics. Traxler asserts that Moore knew he was not doing dressing changes because they were too painful, although it is not clear how frequently he refused dressing changes. Later that night, Traxler was seen again following complaints of not feeling well. Traxler had a low-grade fever, so the nurse called the on-call physician. Given concerns for sepsis, Traxler was sent to the hospital. He was transferred to Mercy Hospital on September 28, 2021, where he underwent a debridement of his right leg wound and had a bone biopsy. Traxler stayed at Mercy Hospital from September 28 through October 8, 2021, when he was discharged to the Dodge infirmary. The day before being discharged to Dodge, a doctor at Mercy Hospital noted, confusingly, that the wound was growing MRSA but also that there was no MRSA. The doctor also diagnosed a

11

possible bone infection and recommended Traxler follow up with Dr. Reynolds. That same day, a nurse practitioner added an addendum to Traxler's records clarifying that he had not had any positive blood cultures, so MRSA was not present. Dkt. No. 138 at ¶¶125-130.

On October 8, 2021, Traxler was transferred to the Dodge infirmary. Traxler was seen by Dr. Reynolds on October 11, 2021 for wound care. At this point, Traxler's wound had been unhealed for ten months and had previously tested positive for MRSA (in September at Waupun, although no MRSA was detected in October at the hospital). Further, a bone biopsy on October 1, 2021 revealed the presence of osteomyelitis, which is an infection in the bone. Dr. Nelson explains that infections typically reach the bone by spreading from nearby infected tissue. The most common treatment for osteomyelitis is surgery to remove portions of the infected or dead bone. Dr. Nelson explains that once bone tissue has died, it cannot be regenerated or replaced. A progress note from a week earlier revealed that Traxler had an exposed tibia over about 4 square centimeters that was "likely dead." Dr. Nelson explains that when a limb is infected, amputation is a treatment option because it both removes the dead tissue and prevents the infection from spreading. Dr. Reynolds and Traxler discussed the possible implications of chronic osteomyelitis, and Traxler inquired about the alternative treatments for an infected bone, including replacing the bone with a steel rod. Dr. Reynolds explained to Traxler that his leg wound was unlikely to heal, even with prolonged administration of antibiotics. She informed him he could continue to live with the un-healed wound, or he could consider having his leg amputated below the knee to resolve the infection and prevent its spread. Dkt. Nos. 91, 128 at ¶¶10-20; Dkt. No. 129-1 at 7.

During Traxler's visit with Dr. Reynolds, she asked Dr. Nelson to look at Traxler's wound and to provide an informal opinion. Dr. Nelson observed what he believed to be a non-healing wound on Traxler's tibia and learned that a bone biopsy had revealed osteomyelitis in the bone.

12

Dr. Nelson asserts that, based on the information he received that day, including but not limited to the presence of chronic osteomyelitis, he agreed with the options presented by Dr. Reynolds. Dr. Nelson advised Traxler to consider an amputation below the knee to resolve the infection in the non-healing wound and the consequent infection in the bone. According to Traxler, Dr. Nelson advised him that replacing the bone with a steel rod was not possible because "the infection would still be there." Dr. Nelson explains that his recommendation was not based on a concern about the presence of MRSA in the wound but on the presence of osteomyelitis in the bone. Dr. Nelson did not have any further contact with Traxler until October 18, 2021. Dkt. Nos. 91, 128 at ¶¶21-30; Dkt. No. 134 at ¶16; Dkt. No. 141 at ¶56.

On October 18, 2021, due to Dr Reynolds' unavailability, Dr. Nelson evaluated Traxler. At that evaluation, Traxler communicated his decision to proceed with the amputation. Traxler now believes he made his decision based on incomplete information, including that he was unaware that there was no current MRSA infection and that the wound had begun to show signs of healing. He also asserts that Dr. Nelson dismissed his inquiries about replacing the bone with a steel rod, informing him that the infection would still be there, even though there was no current *MRSA* infection. Dr. Nelson insists that, given the presence of the *osteomyelitis*, installing a steel rod to replace the bone was not a viable treatment option. Traxler's right leg below the knee was amputated without complication on November 17, 2021. Dkt. Nos. 91, 128 at ¶¶31-38, 42; Dkt. No. 134 at ¶25.

Traxler's amputated leg was sent to pathology, and the results confirmed the presence of gangrenous changes in the presence of acute and chronic osteomyelitis. Dr. Nelson prescribed gabapentin to treat neuropathic pain and placed Traxler on an antibiotic to prevent infection. Traxler was discharged from the hospital on November 19, 2021. Dr. Nelson saw Traxler for a

final time on December 7, 2021. His impression was that Traxler was experiencing his best-case scenario following the amputation. Dkt. Nos. 91, 128 at ¶¶43-55.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co*., 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

**1. A jury could reasonably conclude that Moore and Weinman were deliberately indifferent to Traxler's complaints of pain.**

The Supreme Court long ago explained that the Eighth Amendment proscribes "the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Since then, the Seventh Circuit has repeatedly held that a prison official's refusal to address a prisoner's

14

persistent complaints of severe pain may support an Eighth Amendment claim. *See Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (citing cases).

According to the medical records, Traxler first complained about pain in his right leg in the beginning of December 2020. For the next several months, his wound deteriorated with increased discharge and redness and irritation until Dr. Reynolds completed an intensive debridement on April 1, 2021 to cut out all the dead tissue. Traxler asserts that, in the months prior to the debridement, he repeatedly complained to nurses, Moore, and Weinman that he was in pain, especially during bandage changes. Weinman highlights that Traxler never submitted a health services request directed to him about his pain, but Traxler explains that Weinman was often present at his bandage changes, and he spoke to Weinman about how his current medications were not addressing his pain. Traxler states that Weinman told him he would look into the issue, but nothing changed.

Moore asserts that, from December 2020 through March 2021, Traxler was examined by several offsite specialists and, while they mentioned he was in pain, none of them recommended different pain medications. She also highlights that, after the debridement procedures in April and May, 2021, she was responsive to Dr. Reynolds' recommendations for stronger pain medication such as Norco and oxycodone. Further, Moore requested a higher dosage of oxycodone in June 2021, and prescribed tramadol in September 2021.

But Traxler asserts that, during the months before April 2021 when Norco was prescribed, he repeatedly complained to nurses, Moore, and Weinman about how much pain he was in and that the offsite specialists told him that prison medical staff had to make the decision about his pain medication. He states that, despite reporting this to health services staff, he was given the runaround and informed that the offsite specialists had not recommended different medications.

Traxler further asserts that, while stronger medication such as Norco, oxycodone, and tramadol was briefly prescribed, those prescriptions covered only 49 days of the nearly 1-year ordeal. And, even when those were prescribed, they were often not timely administered, meaning they did not provide relief during his dressing changes, which is when he most needed the relief.

If a jury believes Traxler's version of how Defendants responded (or failed to respond) to his complaints of pain, it could reasonably conclude that Moore and Weinman were deliberately indifferent to his pain. While it is undisputed that the offsite specialists did not initially recommend stronger pain medication, there is no suggestion that they stated different or stronger pain medication was unnecessary. Moore does not explain why she refused to consider stronger or different pain medication in response to Traxler repeatedly telling her that the medication he was then prescribed was inadequate. And, although as health services manager, Weinman was generally entitled to defer to the judgment of prison health officials, he was not entitled to shrug off Traxler's complaints that his pain was not being adequately managed. *See Eagan v. Dempsey*, 987 F.3d 667, 694-95 (7th Cir. 2021). Further, while Moore prescribed stronger medication when it was recommended, a jury could conclude that her failure to try different medications when those limited prescriptions expired and her and Weinman's failure to address Traxler's complaints that his pain medication was not being timely administered prior to his dressing changes demonstrated deliberate indifference to his pain. Moore and Weinman are therefore not entitled to summary judgment on this aspect of Traxler's claim.

**2. While Traxler faces an uphill battle, the Court cannot conclude that no jury could find that Moore and Weinman were deliberately indifferent to the health risks Traxler faced from his leg wound.**

Traxler's Eighth Amendment challenge to the treatment Moore and Weinman provided for his leg wound presents a much closer call at summary judgment. To prevail on a deliberate

16

indifference medical claim under the Eighth Amendment, a plaintiff must prove that prison officials intentionally disregarded a known, objectively serious medical condition that posed an excessive risk to the plaintiff's health. *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (citations omitted). When assessing whether a prison official acted with the requisite state of mind, courts must "examine the totality of an inmate's medical care." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (citations omitted). The Seventh Circuit has made clear that, to establish the requisite mental state, "something more than negligence or even malpractice is required." *Id.* A plaintiff must show "something approaching a total unconcern" for the prisoner's welfare. *See Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (citations omitted). "In other words, the [defendants] may escape liability even if they did not take perfect action." *Id.* at 821-22. Further, it is not enough for a plaintiff merely to show he disagrees with a medical provider's decision or even that medical providers disagree with each other. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Instead, a plaintiff must show that a provider's exercise of medical judgment was "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Id.*

Given the almost nonstop care that Traxler received over the course of a year, it would be hard for any jury to reasonably conclude that Moore or Weinman were deliberately indifferent and intentionally disregarded the serious health risks Traxler faced from the wound on his right leg. The record details countless nursing visits and offsite evaluations with multiple specialists, numerous prescriptions for different antibiotics to treat and prevent infections, stays at multiple hospitals, and progressively aggressive treatments. The record also confirms that Moore escalated Traxler's care when needed—she first referred him to St. Agnes, but when the wound showed little improvement in response to the recommended course of treatment, she referred him to a general

17

surgeon at Waupun.  Similarly, when the wound continued to worsen at the prison, she referred him to Dodge infirmary for more consistent and hands-on care, and then again referred him to general surgery when the wound again began to deteriorate.  And the record shows that, even though, as Traxler's diagnosing and prescribing provider, Moore was not required to follow the offsite providers' recommendations regarding Traxler's care, she consistently did so, placing orders for medication, wound changes, and antibiotics as recommended.

Traxler nevertheless asserts that more should have been done, and he focuses on departures from other providers' recommendations, pointing to instances where some dressing changes were missed by nursing staff or occurred on the wrong days or at the incorrect frequency and that Moore waited until he completed a round of oral antibiotics before transferring him to the hospital to receive IV antibiotics.  In the context of the overall care he received, these examples do not clearly demonstrate deliberate indifference by Moore and Weinman.  They might very well simply be mistakes that might, at worst, rise to the level of negligence, not constitutional violations.  *See Dunigan v. Winnebago Cnty.*, 165 F.3d 587, 592 (7th Cir. 1999).  But, at this point, given the Court's conclusion that Traxler is entitled to proceed to trial on his pain treatment claims, the Court will also allow him to proceed with his wound treatment claims.  Depending on how the evidence is received at trial, however, the Court may be willing to entertain a motion for judgment as a matter of law.  The evidence of Defendants' efforts is substantial and if Traxler's evidence is not compelling, he may not be entitled to submit this issue to the jury.

18

### 3.  Moore and Weinman are not entitled to qualified immunity.

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  When a court reviews a defendant's motion for summary judgment based on qualified immunity, the court considers "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether the constitutional right was clearly established at [that] time."  *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (citing *Pearson*, 555 U.S. at 232); *Estate of Clark v. Walker*, 865 F.3d 544, 549–50 (7th Cir. 2017).

Here, as noted above, "[t]he general standard for liability under the Eighth Amendment for refusal to treat a serious medical condition was well-established at the time of these events.  Indeed, the application of that standard to pain medication was also well-established, and reasonably clear and definite at the time of these events."  *Walker*, 293 F.3d at 1040 (citations omitted).  "And for the reasons already explained, the evidence viewed in the light most favorable to Traxler could allow a jury to find in his favor.  Under these circumstances, Moore and Weinman are not entitled to qualified immunity.  *See Chilcutt v. Santiago*, No. 22-2916, 2023 WL 4678583, at *3 (7th Cir. July 21, 2023) ("[A] district court properly denies a motion for summary judgment based on qualified immunity when the facts, viewed in the light most favorable to the plaintiff, create a genuine dispute about whether the defendants' actions violated a clearly established constitutional right.") (citing *Estate of Clark v. Walker*, 865 F.3d 544, 551 (7th Cir. 2017))  Moore and Weinman's summary judgment motion is therefore denied.

19

**4. A jury could not reasonably conclude that Dr. Nelson was deliberately indifferent to Traxler's serious medical need.**

Traxler asserts that Dr. Nelson demonstrated deliberate indifference to his leg condition because: 1) he did not thoroughly review Traxler's medical records before offering his opinion but instead relied only on Dr. Reynolds' summary of his condition and his visual evaluation of the wound; and 2) Dr. Nelson did not consider alternatives to amputation, such as replacing his tibia with a steel rod. Traxler is particularly focused on Dr. Nelson's mistaken belief that Traxler had a MRSA infection on the day he first evaluated him. According to Traxler, if Dr. Nelson had known he was not infected with MRSA as had been clarified days before Dr. Nelson examined him, he may not have recommended amputation and would likely have considered other treatment options.

The problem with Traxler's speculation about how Dr. Nelson might have responded had he known there was no MRSA infection at the time is that, according to Dr. Nelson, his agreement with Dr. Reynolds' recommendation that Traxler could either live with a wound that was unlikely to heal or have his lower leg amputated had nothing to do with the presence of MRSA. Dr. Nelson explains that his recommendation for amputation as an option was premised on the presence of osteomyelitis, the infection in Traxler's bone. Dr. Nelson asserts, consistent with what he told Traxler at the time, that replacing the bone with a steel rod was not an option because the infection would still be present. Traxler insists that Dr. Nelson was referring to MRSA when he referenced the infection, but Dr. Nelson clarifies that he was referring to the presence of osteomyelitis, the infection in the bone. Dr. Nelson asserts that the pathology of the amputated limb confirmed osteomyelitis along with gangrenous changes, reinforcing in his mind the appropriateness of his recommendation.

As to Traxler's insistence that Dr. Nelson should have personally reviewed his medical records rather than rely on Dr. Reynolds' summary, his failure to do so was not constitutionally problematic.  Dr. Reynolds had been actively involved in Traxler's treatment for more than six months.  She had seen his wound improve and deteriorate multiple times during that period, and she described to Dr. Nelson the findings of Traxler's most recent hospital stay, including that the bone biopsy showed the presence of osteomyelitis.  Nothing suggests that Dr. Nelson had any reason to suspect that Dr. Reynolds' summary of Traxler's condition and treatment was inaccurate or incomplete.  Dr. Nelson also personally examined Traxler's wound, which he found to be consistent with Dr. Reynolds' description.  As a colleague who was familiar with Dr. Reynolds' work and expertise, it was not unreasonable for Dr. Nelson to rely on her representations.  And, in any event, as explained above, Traxler cannot show that he was harmed by Dr. Nelson's mistaken belief about the presence of MRSA because, as Dr. Nelson explains, his recommendation was premised on the presence of osteomyelitis, not the presence of MRSA.  So, even if he had known Traxler was not then infected with MRSA, it would not have impacted his recommendation that Traxler could either continue to live with a wound that was unlikely to ever fully heal or he could opt to amputate the limb.  *See, e.g., Roe v. Elyea*, 631 F.3d 843, 864 (7th Cir. 2011) ("In order to succeed in a § 1983 suit, a plaintiff must establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages.").

Finally, Traxler suggests that he might have been able to show that replacing the infected and gangrenous bone with a steel rod was a viable alternative to amputation if the Court had granted his request to recruit a medical expert.  According to Traxler, a jury could reasonably conclude that Dr. Nelson's failure to seriously consider a steel rod as an alternative to amputation shows that Dr. Nelson's "subjective response was so inadequate that it demonstrated an absence

21

of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998). Traxler's contention fails for at least two reasons.

First, "a party may not manufacture a genuine issue of material fact by speculating about evidence not in the record." *Ellison v. U.S. Postal Servs.*, 84 F.4th 750, 759 (7th Cir. 2023). Traxler speculates what a medical expert *may* have opined, but his speculation does not rebut Dr. Nelson's sworn testimony that replacing the infected bone with a steel rod was not a viable option. Second, even if a medical expert *had* testified that steel rod *could have* been considered as an alternative to amputation, "under Eighth Amendment analysis, evidence that some medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim." *Steel v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996). To prevail, Traxler would have to show that "no minimally competent professional" would have responded as Dr. Nelson responded. But Traxler's own sworn statements make clear that he cannot make such a showing. According to Traxler, Dr. Reynolds and Dr. English both agreed with Dr. Nelson's assessment that Traxler could either continue to live with a wound that was unlikely to ever heal or he could choose to have the limb amputated to stop the spread of the infection and resolve the pain associated with the wound. Dkt. No. 140 at ¶7. Accordingly, Traxler himself concedes that at least two other medical professionals (one of whom was employed by the Department of Corrections and not a personal colleague of Dr. Nelson) responded exactly as Dr. Nelson responded.

In short, Traxler may regret his decision to pursue amputation of his lower leg, but he has offered no evidence to support a conclusion that Dr. Nelson's recommendation that Traxler consider amputation as the only alternative to living with an open wound "was so inadequate that

22

it demonstrated an absence of professional judgment." *Collignon*, 163 F.3d at 989. Accordingly, Dr. Nelson is entitled to summary judgment.

## NEXT STEPS

Traxler's claims against Moore and Weinman will proceed to trial. Given the difficulty of trying a case before a jury, including offering a coherent opening statement and closing argument, presenting and examining witnesses, and locating and introducing evidence, the Court will attempt to recruit a volunteer lawyer to represent Traxler at trial.[1] The demand for volunteer lawyers is high, but the supply is low. As Traxler knows from the Court's prior unsuccessful efforts, few lawyers have the time, ability, or experience to volunteer for cases such as these. The Court encourages Traxler to be patient as it makes efforts to recruit a lawyer to represent him at trial. The Court will promptly notify Traxler in the event a lawyer volunteers to represent him. In the meantime, the Court encourages the parties to explore whether settlement is possible.

**IT IS THEREFORE ORDERED** that Defendant Dr. Eric Nelson's summary judgment motion (Dkt. No. 87) is **GRANTED** and Defendants Mary Moore and Robert Weinman's summary judgment motion (Dkt. No. 93) is **DENIED**.

Dated at Milwaukee, Wisconsin on October 29, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

---

[1] Traxler mentions that, should his case survive summary judgment, Attorney Lonnie Story would be willing to represent him at trial. Story should promptly file a notice of appearance if he is retained by Traxler.

23